UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DARRIN GRUENBERG,

    Plaintiff,

v.                                                          Case No. 09-C-455

CAPT. GEMPELER, et al.,

    Defendants.

**MEMORANDUM AND ORDER**

Plaintiff Gruenberg, who is proceeding pro se, lodged a civil rights complaint under 42 U.S.C. § 1983, alleging that his civil rights were violated when for five days he was held in restraints at Waupun Correctional Institution ("WCI") while correctional officers waited for keys which he had swallowed to pass through his digestive system. Gruenberg claims that the conditions under which he was restrained constitute cruel and unusual punishment in violation of the Eighth Amendment and that since he was placed in restraints without notice and an opportunity to be heard, his right to due process under the Fourteenth Amendment was violated as well. The case is before me on the defendants' motion for summary judgment. For the reasons that follow, the motion will be granted.

**I. Background**

This case arose out of circumstances following the plaintiff's unusual decision to steal a set of keys from a guard and then swallow them. On April 19, 2006, while serving a sentence at

Waupun Correctional Institution, Gruenberg gained control of an officer's key ring while the officer was dispensing medication to him. The keys included a handcuff key, as well as a master key for the padlock to waist restraints, and a key to activate cell doors. The officer observed Gruenberg place the keys into his mouth and swallow them. For obvious reasons, an inmate's capture of keys set off a major security alert within the prison, and the warden and deputy warden were both notified immediately. (DPFOF ¶ 32.) The health unit was also alerted, and Gruenberg was taken to the emergency room at Waupun Memorial Hospital. An x-ray confirmed that the keys were in Gruenberg's abdomen and doctors believed he would pass the keys within five days with the help of a drug Gruenberg agreed to take.

After his examination at the hospital, Gruenberg was returned to prison with the keys still inside him. Upon his return, the defendants strapped him, naked, to a concrete bedpost and gave him a "threadbare" mattress in one of twelve cells on A-Wing of the HSC Building. HSC houses inmates who are pending disciplinary hearings for rule violations, have been found guilty of violations or are in Administrative Confinement. Restraints were placed on his arms, legs and chest. The defendants explain that restraints were necessary in order to prevent Gruenberg from re-obtaining control of the keys after he passed them. In other words, if he were left unrestrained, he could pass the keys and then hide them somewhere in his cell or re-ingest them. *See, e.g., Malone v. Oklahoma*, 168 P.3d 185, 213 (Okla. Crim. App. 2007) (inmate who secreted handcuff key into jail by swallowing it retrieved it from feces and re-swallowed it). After lying on his back for twelve hours in this position, Gruenberg was then strapped to a restraint chair. He alternated between the chair and the bed for five days. He was naked throughout this period, and he claims he was cold. Gruenberg asserts that the lack of exercise and movement hindered his ability to pass the keys

2

through his system, although the defendants note that he was allowed thirteen exercise breaks in five days. Gruenberg also asserts that the position was painful and that he was denied common hygiene items. In addition, although the defendants assert he was allowed to use the bedpan and urinal whenever he requested, Gruenberg alleges he was forced to lie in his own feces on two occasions and was denied the ability to clean himself. The defendants state that he was allowed to wash or shower three times.

**II. Analysis**

**A. Motion to Appoint Counsel**

I begin with plaintiff's motion(s) to appoint counsel.[1] Although I have already denied these motions, Gruenberg has repeatedly renewed them and in a previous order I indicated the matter would be revisited if circumstances warranted it. It is thus worth setting forth my reasoning for continuing to deny the motion to counsel.

Gruenberg asserts that he has significant mental deficiencies and is not schooled in the law. I may take him at his word for both propositions. On the latter point, however, a lack of legal training is not sufficient to justify appointment of counsel because otherwise every *pro se* litigant would be entitled to free legal representation. Instead, the question is whether a litigant has an adequate ability to alert the court to the nature of his claim and to marshal and explain the facts underlying that claim. This analysis involves not just an inquiry into the mental state of the litigant

---

[1] Courts routinely note that there is no statutory provision for appointment of counsel. The statute says that a judge may "request" that an attorney represent a litigant, 28 U.S.C. § 1915(e)(1), and so "appointment of counsel" is actually a polite way of saying that the district judge calls multiple attorneys in an effort to get one of them to take a case for no pay.

but also an assessment of the complexity of the case, its potential merit, and such things as the litigant's difficulty of obtaining evidence from a prison cell. "The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand." *Pruitt v. Mote,* 503 F.3d 647, 655 (7th Cir. 2007). As the Seventh Circuit has noted, a litigant has a right to access the courts, but not a right to have his claims presented effectively. "The right of access to the courts protects prisoners from 'being shut out of court,' it does not exist to 'enable the prisoner . . . to litigate effectively once in court.'" *Id.* at 657 (citations omitted).

Here, I have determined twice already that the facts of this case, while unusual, are not so complicated that a reasonable *pro se* litigant in prison could not prosecute the action. I reiterate that conclusion here. In addition, it is clear that even if Gruenberg suffers from certain mental conditions that the typical inmate does not experience, these have not impacted his ability to defend against the motion for summary judgment. He has filed numerous declarations providing copious amounts of detailed information about what happened to him, almost on an hourly basis, during the period he complains about. His brief sets forth his complaint about the conditions of his confinement. In this Court's experience, Gruenberg's presentation of the facts was significantly *above* the average *pro se* litigant's capabilities. There is no mystery what this case is about; to put it another way, if Gruenberg loses it is not because something was left out of his presentation, it is because the facts do not warrant relief. Accordingly, I conclude that Gruenberg is not entitled to appointed counsel.

**B. Eighth Amendment**

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Most of the material facts here

4

are not in dispute; instead, the parties emphasize different aspects of Plaintiff's treatment in custody and the reasons for that treatment. Where disputes arise, I resolve them at this stage in favor of Gruenberg, the non-moving party.

To succeed on a claim under the Eighth Amendment, Gruenberg needs to present evidence from which a fact finder could conclude that the conditions of his confinement resulted in "the denial of the minimal civilized measure of life's necessities," and that the defendants were deliberately indifferent to the conditions in question, meaning that they knew of and disregarded an excessive risk to Gruenberg's health or safety. *See Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). But the Eighth Amendment does not proscribe only those conditions of confinement that are likely to cause death or serious injury. It also proscribes conditions that "involve the wanton and unnecessary infliction of pain," including "pain without any penological purpose." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Even more fundamentally, the Eighth Amendment protects the basic dignity of the person being punished. *See Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man."); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("The use of the hitching post under these circumstances violated the 'basic concept underlying the Eighth Amendment [, which] is nothing less than the dignity of man.' ") (quoting *Trop*, 356 U.S. at 100.). It prohibits treatment that robs the inmate of his innate dignity as a human being. *Bowers v. Pollard*, 602 F. Supp. 2d 977 (E.D. Wis. 2009)., *aff'd*, 2009 WL 2971085 (7th Cir. 2009) (unpublished).

Defendants rely heavily upon this court's decision in *Bowers* as support for their argument that they are entitled to summary judgment. In that case, the court granted summary judgment

5

despite undisputed evidence that the plaintiff was held naked in essentially the same kind of restraints for as long as twelve hours and was forced to urinate and defecate on himself. But *Bowers* differs from this case in several significant ways. Not only was Gruenberg restrained for a significantly longer time, but Bowers also had a history of far more extreme and ongoing self-destructive behavior that is not present here. There I noted that "given [Bowers'] repeated efforts to harm himself, even as he was being returned to his cell following a trip to the hospital . . . , it was reasonable to believe he would return to such behavior if not restrained." 602 F. Supp.2d at 990. Here, by contrast, other than the impulsive act of swallowing the keys (and even that's equivocal), the defendants have offered no evidence that Gruenberg was attempting to harm himself or others.

Moreover, even though summary judgment was granted in *Bowers*, this court noted that the "most troubling" aspect of Bowers' treatment was the fact that he was naked throughout the period of his restraint and was not even released when he needed to use a toilet. Indeed, the court declined to hold that these conditions did not amount to cruel and unusual punishment and instead turned to the question of whether the defendants had acted with the requisite intent:

> Forced nudity can degrade and humiliate a prisoner. Refusing to allow him the use of a toilet so that he urinates or defecates on himself adds to the degradation. Absent a justification for such conditions, I am unable to say that they do not fall within the meaning of cruel and unusual punishment proscribed by the Eighth Amendment. . . . . On the record before me, I am unable to determine whether, under the circumstances of this case, these conditions fall below Eighth Amendment standards. I therefore turn to the second element of the claim-whether the defendants denied Bowers civilized conditions of confinement intentionally or recklessly.

*Id.* at 992. Given the extreme and continuous self-destructive behavior with which the defendants were faced in that case, the court concluded that a reasonable jury could not conclude that the defendants had the requisite intent. Here, it is not so clear.

6

Defendants contend that it was necessary to place Gruenberg in restraints because of the need to regain control of the keys once they were expelled and keep Gruenberg from passing them to other inmates, hiding them somewhere else, or even re-ingesting them himself. (Doc. 62, ¶¶ 37, 44.) Based on the record before me, a fact finder could conclude otherwise. Gruenberg was released from the restraints and placed in one of the negative airflow cells generally used for inmates suspected of having communicable diseases, such as tuberculosis, on April 24. Located in the HSU, the room had a bed and mattress, and Gruenberg was given clothing, a blanket, soap and a towel. Two days later, on April 26, he was transported to Waupun Memorial Hospital where he underwent endoscopy and colonoscopy to extract the keys. Two of the keys were recovered during the endoscopy, but doctors were unable to remove the third. The following day, Gruenberg was returned to WCI where he was returned to a cell. HSU staff continued to monitor him and check his stools until the third key was passed on May 3, 2006. Based on these facts, Gruenberg reasonably contends that there was never a need for the mechanical restraints, especially after the first twelve hours, and defendants could have placed him in a cell in HSU initially.

But even if Gruenberg did need to be restrained, why was it necessary to keep him completely naked and uncovered throughout the entire period, especially at night when he complained of being cold? And why, if his version is to be taken as true, which it must at this stage of the proceedings, was he left to sit in his own feces and urine? Defendants claim that inmates placed in restraints are strip searched and not allowed to have any clothing to ensure that they don't have access to weapons or contraband. (*Id.*, ¶¶ 53, 54.) They are not allowed a blanket because the security staff must be able to ensure that the inmate is breathing and that he has not slipped out of the velcro restraints. (*Id.*, ¶ 123.) These explanations also seem weak. The reason for conducting

7

a strip search is to make sure the inmate has no weapon or other contraband hidden anywhere on, or in, his person. Once the strip search is completed, this risk would seem to be eliminated. And to the extent it is necessary for the restraints to remain uncovered so the guards can be sure the inmate doesn't slip out of them, no reason appears why the inmate could not be at least partially covered.

If, as defendants contend, the temperature in Gruenberg's cell ranged between 72 and 77 degrees, a jury could reject his claim that keeping him naked and immobilized all night on a "threadbare mattress" placed over concrete without a blanket amounts to cruel and unusual punishment. But Gruenberg notes that the temperatures the defendants cite were taken in hallways, and not in the cells whose back walls formed the outer wall of the building, and contends he was extremely cold. *See Gillis v. Litscher*, 468 F.3d 488 (7th Cir. 2006) (holding that inmate's claim that he was cold when placed in cell with no clothing or bedding, combined with the denial of toilet paper and other personal hygiene articles, sufficient to show Eighth Amendment violation even though the evidence showed that his cell was kept at 70 degrees or above). Finally, it is worth noting that the Wisconsin Department of Corrections regulation that authorizes the use of mechanical restraints to immobilize inmates, Wis. Adm. Code § DOC 306.11, says nothing about removing the inmate's clothing. It does state, however, that "[i]f possible, staff may release an inmate from restraints to perform bodily functions and for meals." §DOC 306.11(3)(c).

Based on the foregoing, I conclude that a reasonable fact finder could conclude from the evidence viewed in the light most favorable to the plaintiff that the conditions to which Gruenberg was subjected over the five-day period while prison staff were waiting for the keys to pass amounted

to cruel and unusual punishment. I therefore proceed to the defendants claim that they are entitled to qualified immunity.

**C. Qualified Immunity**

Even assuming the conditions under which Gruenberg was held amount to cruel and unusual punishment, I conclude that the defendants are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 129 S.Ct. 808, 815 (2009). All officials, save the "plainly incompetent or those who knowingly violate the law" are protected by qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

This case presents a classic situation in which the doctrine is required to shield officials acting in good faith in responding to a unique situation that involved both inmate health and prison security. First, the defendants were confronted with what to them was the unprecedented breach of security: Gruenberg had stolen and swallowed a handcuff key, a master key for belt restraints, and one of the keys used for opening cell doors. By doing that, the plaintiff made his own body and its most private and embarrassing functions a matter of prison security. The Eighth Amendment itself, of course, does not provide a clear roadmap as to how prison staff must treat an inmate who has swallowed a set of keys. Thus, the defendants found themselves, to a large extent, in uncharted waters.

9

The physician who examined Gruenberg informed the prison officials that he would most likely pass the keys within five days. Rather than request immediate surgery, the defendants elected to wait. The defendants also determined, however, in what may have been an abundance of caution that it was necessary that Gruenberg remain without clothing in order to observe and secure the keys once they passed through his system without any chance that he would be able to pass them to another inmate, re-ingest them or secret them on his person. The conditions under which he was placed were thus not based on any wantonness or indifference to his physical or mental health and safety; they were instead the result of what in hindsight appears an overcautious effort to maintain the security of the institution.

In *Farmer v. Brennan*, the Court held that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." 511 U.S. at 847. The record here belies any suggestion that the defendants knew Gruenberg faced any risk of serious harm. Indeed, the defendants took extraordinary steps to insure he did not suffer serious harm. Pursuant to DOC policy, security personnel sought the input of WCI's health and clinical staff throughout the process to insure that Gruenberg's physical and mental health needs were met. Nursing staff from the WCI Health Services Unit ("HSU") were present when Gruenberg was initially placed in restraints to monitor his vital signs and check restraint placement to ensure they did not adversely affect circulation to any part of his body. A clinical staff member of the Psychological Services Unit ("PSU") was also present and evaluated Gruenberg when he was initially placed in restraints. A nurse from HSU checked his condition and documented his or her findings every four hours, and clinical staff saw him regularly as well.

Nurses applied antibiotic ointment to scabbed areas and lotion to dry parts of his skin. They also applied a bandage to his tailbone area, which had become reddened and sore. Finally, Gruenberg's condition was also checked by security staff every fifteen minutes throughout the period he was restrained, and a log was kept of his condition and concerns. Although Gruenberg disputes their findings and claims they failed to note all of his complaints, it is undisputed that he was assessed by nurses from the HSU some thirty-one times during the five-day period. He was visited and assessed by the clinical staff from the PSU nine times. Medical and mental health monitoring and treatment on this scale is simply inconsistent with the claim that the defendants intentionally or recklessly acted to subject Gruenberg to cruel and unusual punishment.

More importantly for purposes of determining whether the defendants are entitled to qualified immunity, I note that Plaintiff has sued some twenty-five people, including several nurses, licensed psychologists and other health care providers. This at least weakens the claim that Gruenberg's right to be free of the conditions he complains about was "clearly established." The idea that so many trained prison staff members, including health providers, would have failed to recognize a constitutional violation is difficult to believe. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001). I do not suggest that the number of defendants is itself dispositive in such an inquiry, but here the record shows that these multiple defendants were working in concert with each other – monitoring Plaintiff's restraints, temperature, psychological status, etc., and treating his scabs and wounds – and that all of them evidently believed their actions were reasonable under the

circumstances. This at least suggests that any additional rights Gruenberg may have had were not clearly established.

More importantly, the unusual circumstance Gruenberg created has little precedent that staff members could reasonably have appreciated. Notably, neither side has been able to cite any precedential case even remotely similar to this one, where an inmate's own behavior created a security and health risk that required the *ad hoc* imposition of unique conditions of confinement for a limited period.[2] This is not to say that officials are off the hook anytime a similar case does not exist, but it is a practical recognition that there was simply no constitutional benchmark here to which prison staff could measure their response. Qualified immunity is designed to shield officials from liability when they exercise their judgment, particularly in gray areas where the contours of the Eighth Amendment are not clear. Here, they exercised their judgment in a case involving both prison security and the inmate's health, and in a case like this the immunity doctrine means they are entitled to the benefit of the doubt. *Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir. 1991).

**D. Due Process**

Plaintiff's complaint also suggests (albeit in a footnote) that his conditions of confinement violated Due Process. Under *Sandin v. Conner*, 515 U.S. 472, 484 (1995), prison discipline that involves "atypical and significant hardship in relation to ordinary incidents of prison life" requires the prison to give the inmate notice and an opportunity to be heard, i.e., a chance to explain his conduct before the prison imposes the disciplinary conditions. The problem is that the conditions

---

[2]Plaintiff cites *Friends v. Moore,* 776 F. Supp. 1382 (E. D. Mo. 1991), in which an inmate swallowed a cuff key and was placed in a dry cell and ultimately a "strip cell." In that case, however, the court found no constitutional violation because the defendants' actions were required to restore order.

12

imposed here, as explained above, were not disciplinary in nature but were designed to retrieve the keys Gruenberg had swallowed and prevent him from reacquiring them. That is, the determination to place Gruenberg in restraints was not punishment for an infraction, and as such it would not have made sense to hold a hearing or allow Gruenberg to explain himself: the x-rays showed the keys in his system and he never denied ingesting them. As the Seventh Circuit noted in *Bowers,* such claims "are better conceptualized under the Eighth Amendment." 345 Fed. Appx. at 196. Accordingly, to the extent Gruenberg brings a due process claim, it is dismissed as well.

**III. Conclusion**

For the reasons given above, the defendants' motion for summary judgment is **GRANTED**. All other pending motions are **DENIED**.[3] The case is **DISMISSED**.

**SO ORDERED** this      30th      day of September, 2010.

                                                s/ William C. Griesbach
                                                William C. Griesbach
                                                United States District Judge

---

[3]Plaintiff filed several discovery motions, but they are now moot. In granting summary judgment to the defendants, I accepted all of Plaintiff's allegations as true. As such, additional discovery would not have been material to the outcome here.